UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATIONS, THE FIRST LIBERTY INSURANCE CORPORATION, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY COUNTY MUTUAL INSURANCE COMPANY, and LM PROPERTY AND CASUALTY INSURANCE COMPANY | **MEMORANDUM & ORDER**<br><br>11-CV-5780 |

                                        Plaintiffs,

– against –

EXCEL IMAGING, P.C.,

– and –

MARK D. FREILICH, M.D., FAISAL
ABDUS SAMI, M.D., TARIQ R. KHAN,
M.D., PERVEZ IQBAL QURESHI, M.D.
a/k/a PERVAIZ QURESHI, M.D., and
NAIYER IMAM, M.D.

          (the "Nominal Owner Defendants")

– and –

AZFAL M. AMANATA, MOHAMMED
SHAFKAT ILAHI, CLAIMNET L.L.C., and
AMAAR HOLDING INC.,

          (the "Management Defendants")

                                Defendants.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 2 1 2012 ★
BROOKLYN OFFICE

**Appearances:**

Plaintiffs:                          Barry I. Levy
                                      Rivkin Radler LLP
                                      926 RXR Plaza
                                      Uniondale, NY 11556-0926

1

Glenn H Egor
Rivkin Radler LLP
926 EAB Plaza
Uniondale, NY 11556

Michael A. Sirignano
Rivkin, Radler LLP
926 RXR Plaza
Uniondale, NY 11556-0926

Frank Peter Tiscione , Jr.
Rivkin Radler
926 RXR Plaza
Uniondale, NY 11556

Defendant Mark D. Freilich, M.D.:    Robert Adam Freilich
Rottenberg Lipman Rich P.C.
369 Lexington Avenue
New York, NY 10017

All Other Defendants:    Matthew J. Conroy
Blodnick, Conroy, Fazio & Diglio, P.C.
1325 Franklin Avenue, Suite 555
Garden City, NY 11530

Maria Campese Diglio
Blodnick, Conroy, Fazio, & Diglio, P.C.
1325 Franklin Avenue, Suite 555
Garden City, NY 11530

**JACK B. WEINSTEIN, Senior United States District Judge:**

I.    Introduction ................................................................................................................ 4

II.   Facts ........................................................................................................................... 5

     A.    Parties ................................................................................................................. 6

2

B.    New York State No-Fault Law ................................................................ 7
C.    Fraudulent Scheme ............................................................................... 10
D.    Prior Litigation .................................................................................... 16
E.    Investigation of Excel .......................................................................... 17
III.   Procedural History ........................................................................................ 17
IV.    Jurisdiction .................................................................................................... 18
V.     Legal Standards ............................................................................................. 18
A.    Motion to Dismiss ............................................................................... 19
B.    Summary Judgment ............................................................................. 19
VI.    Motion to Compel Arbitration ...................................................................... 20
A.    Right to Arbitrate No-Fault Claims .................................................... 20
B.    Waiver of Right to Arbitration ............................................................ 22
C.    Arbitration Stayed Pending Resolution of this Case .......................... 23
VII.   Statute of Limitations .................................................................................... 24
A.    RICO Claims ....................................................................................... 24
    1.    Generally ....................................................................................... 24
    2.    Separate Accrual ........................................................................... 24
B.    State Law Claims ................................................................................ 26
    1.    Statute of Limitations for Duties Imposed by Statute .................. 27
    2.    Claims Subject to Three-Year Statute of Limitations .................. 31
C.    Equitable Estoppel ............................................................................... 33
D.    Issues of Fact as to When Plaintiffs Could Have Discovered the Fraud ...................... 34
VIII.  Failure to State a Claim ................................................................................. 37
A.    State Law Causes of Action ................................................................ 38
    1.    Ability to Recover Fees Paid to Fraudulently Incorporated Medical Services
          Corporations .................................................................................. 38
    2.    Common Law Fraud Pled with Sufficient Particularity ............... 40
    3.    Unjust Enrichment ......................................................................... 41
B.    RICO .................................................................................................... 41
    1.    General Principles .......................................................................... 41
    2.    Enterprise ....................................................................................... 42
    3.    Conduct .......................................................................................... 43
    4.    Racketeering Activity Requirement .............................................. 44
    5.    Pattern Requirement ...................................................................... 46
C.    RICO Conspiracy ................................................................................ 46

IX.   Conclusion .......................................................................................................... 47

I.    **Introduction**

New York's no-fault insurance laws permit lawfully incorporated medical services corporations, as assignees of no-fault benefits, to collect payment from insurance companies for services provided to injured motorists. *See* Part II(B), *infra.* As a prerequisite to reimbursement, these corporations must comply with state and local licensing requirements, such as being owned and operated by physicians who practice through the corporation. *See* 11 N.Y. Comp. Code R. & Regs. tit. 11, § 65–3.16(a)(12).

Plaintiff insurance companies ("Liberty Mutual") seek to recover payments already made to one such medical services corporation, Excel Imaging, P.C. ("Excel"), and for a declaratory judgment that Excel is not entitled to reimbursement for claims not yet paid. They do not allege that the defendants failed to provide radiology services to their insureds, or that these services were not medically necessary. Rather, they claim that Excel is not owned and operated by physicians—namely, defendants Mark Freilich, M.D., Faisal Abdus Sami, M.D., Tariq R. Kahn, M.D., Perez Iqbal Qureshi, M.D., and Naiyer Imam, M.D. ("Nominal Owner Defendants")—as required by New York law, but by non-physicians Afzal M. Amanat and Mohammed Shakat Ilahi and their corporations, Claimnet L.L.C. and Amaar Holding, Inc. ("Management Defendants"). Plaintiffs assert that they were billed over $1.2 million in charges for radiology services that the defendants were not entitled to recover because their incorporation and operation violated New York statutes and regulations. They claim: 1) fraud and unjust enrichment under state law against all defendants; and 2) civil Racketeering Influenced Corrupt Organizations Act ("RICO") violations under federal law against the individual defendants.

4

Defendant Mark Freilich, M.D. moves for summary judgment on the ground that the claims against him are time-barred. The remaining defendants ("Non-Freilich Defendants") move to either stay the action and compel arbitration pursuant to N.Y. Business Insurance Law § 5106, or to dismiss the complaint based on the statute of limitations. Both argue that the complaint must be dismissed for failure to state a claim on which relief can be granted. *See* Fed. R. Civ. P. Rule 12(b)(6).

Defendants' motions are denied. Plaintiffs may only be compelled to arbitrate unpaid claims on which defendants have taken no legal action; they may not compel arbitration for paid claims, or for unpaid claims on which they have sued the plaintiffs. Arbitration is stayed in the interest of judicial economy. A genuine issue of material fact exists as to when plaintiffs were on inquiry notice of the fraud and whether they were misled by defendants' affirmative efforts to conceal the scheme, which would result in equitable tolling, precluding summary judgment. The facts alleged support claims for both civil RICO violations and state law fraud and unjust enrichment.

II.   **Facts**

Defendants' motions to dismiss on the pleadings were converted to motions for summary judgment. Order, Doc. Entry 38, Apr. 13, 2012. Further discovery before a decision on the pending motions was waived. *See* Stipulation, Doc. Entry 48, May 3, 2012. The facts are drawn primarily from the complaint and are deemed true for the purpose of these motions.

A. **Parties**

Plaintiffs are insurance companies with their principle place of business in Massachusetts; they are authorized to conduct business and issue automobile insurance policies in New York. Compl. ¶¶ 7-11, Doc. Entry 1, Nov. 23, 2011. Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations, *id.* ¶ 7; Liberty Insurance Corporation, the First Liberty Insurance Corporation, and LM Insurance Corporation are Illinois corporations, *id.* ¶ 8; Liberty Mutual Fire Insurance Company is a Wisconsin corporation, *id.* ¶ 9; Liberty County Mutual Insurance Company is a Texas corporation, *id.* ¶ 10; and LM Property and Casualty Insurance Company is an Indiana corporation, *id.* ¶ 11.

Excel, a New York professional service corporation providing radiology services, has its principal place of business at 72-35 51st Avenue in Woodside, NY. *Id.* ¶ 12. It also operates from 3746 Nostrand Avenue in Brooklyn, New York and 5000 Broadway in New York, New York. *Id.* Plaintiffs allege that all of these properties are owned and controlled by the Management Defendants. *Id.*

Excel was initially incorporated in New York on June 5, 2000. *Id.* ¶ 14. Plaintiffs allege that it is the successor to another medical services corporation, Kings Highway Diagnostic Imaging, P.C. d/b/a Ultra Diagnostic Imaging ("Kings Highway"), which was nominally owned by non-party Ravindra Ginde, M.D. *Id.* ¶ 15. Over the course of its existence, Excel has had several different apparent owners, the Nominal Owner Defendants, as follows:

- Dr. Freilich from June 5, 2000 to September 27, 2006. *Id.* ¶ 16. He was previously an independent contractor of Kings Highway. *Id.* ¶ 41.
- Dr. Sami from May 15, 2006 to May 18, 2010. *Id.* ¶ 18.
- Dr. Khan from June 15, 2006 to May 18, 2010. *Id.* ¶ 19.

6

- Dr. Qureshi from January 8, 2008 through the present. *Id.* ¶ 20.
- Dr. Imam from February 22, 2011 through the present. *Id.* ¶ 21.

Several of these physicians continued to reside in states outside of the New York metropolitan

area while nominally owning Excel. *Id.* ¶ 18 (stating that Sami continued to reside in Illinois);

*id.* ¶ 21 (stating that Imam continued to reside in Virginia). Others specializing in non-radiology

fields were allegedly incapable of participating in the operations of the company. *Id.* ¶ 19

(stating that Khan specializes in pediatric medicine); *id.* ¶ 20 (stating that Qureshi specializes in

internal medicine).

Plaintiffs contend that Excel has been secretly owned and operated by the Management

Defendants since its creation. Although defendants Amanat and Ilahi purport to be mere

administrators or managers of Excel, it is alleged that they in fact control all aspects of its

operations and derive economic benefit from it. *Id.* ¶¶ 22-23. Together, they own Claimnet,

LLC ("Claimnet") a New Jersey limited liability corporation which purports to provide billing

services to Excel and through which, it is alleged, they siphon off that corporation's profits. *Id.* ¶

24. Its main address, 271 Route 46 West in Fairfield, New Jersey is also Excel's billing address.

*Id.* Amaar Holding, Inc., a New York corporation also owned by the defendants, owns the

Woodside address from which Excel operates. *Id.* ¶ 25.

## B. New York State No-Fault Law

New York's no-fault insurance laws are intended to ensure that injured motorists have an

efficient mechanism to secure healthcare services needed as a result of motor vehicle accidents.

*See* N.Y. Bus. Ins. Law §§ 5101 *et seq.*; 11 N.Y. Comp. Codes. R. & Reg. §§ 65 *et seq.* They

mandate that all automobile owners purchase insurance, and require all insurers to provide up to

7

$50,000 per insured for necessary health care expenses, including diagnostic tests such as MRIs. *See* N.Y Bus. Ins. Law §§ 5101-109.

Insureds may assign their right to no-fault benefits to qualified "providers of health care services," permitting medical service corporations to seek payment directly from insurers for services they provide. *See* 11 N.Y. Comp. Code R. & Regs. tit. 11, § 65-3.11(a) ("An insurer shall pay benefits for any element of loss other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section 5102(a)(1) of the Insurance Law."). To submit such a claim, the New York State Department of Insurance requires that assignees use what is commonly known as an "NF-3" form. Compl. ¶ 31.

In order to be eligible for no-fault reimbursement, medical services corporations must comply with all applicable New York State and local licensing requirements. 11 N.Y. Comp. Code R. & Regs. tit. 11, § 65–3.16(a)(12) ("A provider of health care services is not eligible for reimbursement . . . if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York."). These regulations were promulgated "to combat rapidly growing incidences of fraud in the no-fault regime . . . identified as correlative with the corporate practice of medicine by non-physicians." *State Farm Mut. Auto. Ins. Co. v. Mallela,* 827 N.E.2d 758, 759 n.2 (N.Y. 2005).

Under New York law, medical service corporations must be owned and controlled exclusively by licensed medical professionals who practice medicine through the corporation. *See, e.g.,* N.Y. Bus. Corp. Law § 1507 ("A professional service corporation may issue shares

8

only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice."). Only licensed professionals may render the services provided by such corporations. *See id.* § 1503(b) ("The certificate of incorporation of a professional service corporation shall meet the requirements of this chapter and . . . shall have attached thereto a certificate or certificates issued by the licensing authority certifying that each of the proposed shareholders, directors and officers is authorized by law to practice a profession which the corporation is being organized to practice and, if applicable, that one or more of such individuals is authorized to practice each profession which the corporation will be authorized to practice."); *id.* § 1504(a) ("No professional service corporation, including a design professional service corporation, may render professional services except through individuals authorized by law to render such professional services as individuals."). Unlicensed individuals may neither employ nor supervise other physicians, *see* N.Y. Bus. Corp. Law § 1508 ("No individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice and is either a shareholder of such corporation or engaged in the practice of his profession in such corporation."), nor derive economic benefit from physician services, *see* N.Y. Educ. Law § 6509-a (forbidding fee splitting with non-physicians). Moreover, the medical services corporation must be owned by a physician who actually engages in the practice of medicine through the professional corporation. *See* N.Y. Bus. Corp. Law § 1508 ("No individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice and is either a shareholder of such corporation or engaged in the practice of his profession in such corporation.").

9

Healthcare service providers are not eligible to receive no-fault benefits if they are incorporated in violation of any of these provisions. *See Mallela,* 827 N.E.2d at 319-320. Nor may a medical services corporation bill for services provided by physicians who are not employees of the corporation, such as independent contractors. *See* 11 N.Y. Comp. Code R. & Regs. § 65–3.11(a); N.Y. Ins. Gen. Counsel Op. No. 05–03–21 (2005); N.Y. Ins. Counsel Op. No. 01–02–13 (2001); *see also, e.g., Craig Antell, D.O., P.C. v. N.Y. Cent. Mutual Fire Insurance Co.,* 816 N.Y.S.2d 694, at *1 (1st Dep't 2006) (table) (stating that, where a medical services corporation seeks to recover no-fault benefits for services which were not rendered by it or its employees, but rather by a treating provider who is an independent contractor, the corporation is not a "provider" of the medical services rendered within the meaning of Department of Insurance Regulations, and is not entitled to recover "direct payment" of assigned no-fault benefits from the defendant insurer).

Healthcare providers are warned on the NF-3 form that "[a]ny person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime." N.Y. Ins. Law § 403(e).

### C. Fraudulent Scheme

Defendants' alleged fraudulent scheme predates the incorporation of Excel. In 1995, Kings Highway was incorporated as a radiology services practice under the nominal ownership of Dr. Ginde. Compl. ¶ 40. Plaintiffs contend that that corporation was actually owned and operated by Management Defendants Amanat and Ilahi. *Id.* ¶ 42. Nominal Owner Defendant

10

Dr. Freilich, who was an independent contractor for Kings Highway, testified in a December 17, 2003 examination under oath that: 1) Amanat was the sole owner of Kings Highway; 2) his paychecks from Kings Highway were signed by Amanat; 3) Dr. Ginde did not work at Kings Highway; and 4) Ilahi was his only contact with Kings Highway. *Id.* ¶¶ 41-42.

In 2000, Amanat and Ilahi approached Freilich and invited him to participate in a similar scheme. *Id.* ¶ 43. Amanat and Ilahi would provide all of the start-up costs to launch Excel, a new medical services corporation. *Id.* ¶ 46. In order to permit Excel to receive a certificate of authority to operate a medical practice, Dr. Freilich agreed to represent in its certificate of incorporation that he was the shareholder, director, and officer of Excel and that he owned, controlled, and practiced through it, in exchange for a salary or some other form of compensation. *Id.* ¶ 44.

Excel did not begin operating until 2003. *Id.* ¶ 48. In the meantime, Kings Highway continued to function. *Id.* In response to investigations into Kings Highway and Dr. Ginde, Amanat and Ilahi decided to wind down that company's operations and replace it with Excel. *Id.* Because the company was not actually owned and operated by physicians, Kings Highway's certificate of incorporation was revoked in 2007 for its failure to comply with Business Corporation Law § 1503 in violation of Education Law § 6530(12). *Id.* ¶ 52. Dr. Ginde's medical license was revoked in 2005 because of his negligent interpretation of MRIs. *Id.* ¶ 15.

In 2003, Dr. Freilich testified in a deposition conducted by an unrelated insurance company that "everything [was] the same" at Excel as it previously had been at Kings Highway. *Id.* ¶ 54. Although ostensibly a different company, Excel operated from the same address in Woodside, New York; used the same telephone number; and submitted bills and reports on

11

Kings Highway referral forms. *Id.* ¶ 53. Amanat and Ilahi controlled the operations of Excel, just as they had controlled the operations of Kings Highway. *Id.* ¶¶ 45, 56. Dr. Freilich testified that he was "not in charge of anything" at Excel, *id.* ¶¶ 54, 58, and was "not really doing much" at Excel, *id.* ¶ 58. He considered himself an independent contractor and was paid as such, receiving $40 for every film he read. *Id.* Nevertheless, he continued to represent that he was the owner and operator of Excel to the New York State government on biennial statements. *Id.* ¶ 44.

In order to conceal their ownership of the company, Excel entered into agreements with the Management Defendants to provide management, marketing, and/or billing services to the company. *Id.* ¶ 60. These agreements kept "Excel in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporation, its accounts receivables, and any profits" it made. *Id.* ¶ 61. Amanat and Ilahi also obtained a stamp of Dr. Freilich's signature, which they used in conducting the corporation's daily operations. *Id.* ¶ 62.

In 2006, when the New Jersey and New York State Boards of Medical Examiners began investigating Dr. Freilich for various practices unrelated to the incorporation of Excel, Amanat and Ilahi decided to replace Freilich as the nominal owner of the corporation. *Id.* ¶¶ 63-64. They directed Dr. Freilich to transfer his ownership interest to Nominal Owner Defendants Dr. Sami and Dr. Khan. *Id.* ¶ 65. Dr. Freilich was disciplined by the New Jersey and New York Boards of Medical Examiners in 2006 and 2007, respectively, for negligent interpretation of MRIs and for permitting his name to be used improperly on the letterhead of a New Jersey professional services corporation. *Id.* at ¶ 17.

In executing the nominal transfer of Excel's ownership, none of the physicians behaved with due diligence. Although Amanat and Ilahi hired counsel to represent Excel in this transaction, none of the physicians were represented. *Id.* ¶ 67. Nor did Dr. Sami and Dr. Khan review the pre-existing agreements between Excel and the Management Defendants. *Id.* ¶ 70. Dr. Sami and Dr. Khan did not invest any money in Excel, and Dr. Freilich was paid a small fee in exchange for giving up what was, on its face, his valuable ownership stake. *Id.* ¶ 68.

Once the transfer was complete, the Management Defendants' relationship with Dr. Sami and Dr. Khan, and the physicians' relationship to Excel, was the same as it had been with Dr. Freilich. The physicians falsely represented to the New York licensing authorities that they owned, controlled, and practiced through Excel. *Id.* ¶ 69. In fact, they ceded responsibility for the management of the company to the Management Defendants, who continued to exercise control over Excel through their contracts for management, billing, and other services. *Id.* ¶¶ 71, 72. The Management Defendants obtained a stamp of the physicians' signatures. *Id.* ¶ 77. In reality, Dr. Sami and Dr. Khan, like Dr. Freilich before them, were nothing more than de facto employees of the Management Defendants. *Id.* ¶ 76.

During the period of their nominal ownership, Dr. Sami and Dr. Khan did not actually practice medicine through Excel. Dr. Sami, an Illinois resident, continued to reside in that state. *Id.* ¶ 79. He never directed or supervised the healthcare services provided by Excel. *Id.* The Management Defendants routinely misspelled his last name on Excel's billing paperwork. *Id.* Dr. Khan, a pediatrician, had no experience or training in the radiology services Excel provided and never signed any report of assignment of benefits on behalf of Excel. *Id.* ¶ 80.

13

In late 2007, Amanat and Ilahi, concerned that Dr. Sami and Dr. Khan might try to withdraw from the scheme, recruited an additional physician, Nominal Owner Defendant Dr. Qureshi, to act as nominal owner of Excel. *Id.* ¶¶ 81-82. As before, Dr. Qureshi did not pay fair value to acquire shares of the company, *id.* ¶ 83, and did not engage in ordinary due diligence, such as reviewing Excel's contracts with the Management Defendants, *id.* ¶ 85. Although Dr. Qureshi represented himself as the owner and operator of the corporation, Excel's actual operations remained unchanged . *Id.* ¶¶ 84-88. The Management Defendants continued to exercise actual control. *Id.* ¶¶ 87, 90. As before, they acquired a stamp of Dr. Qureshi's signature to facilitate their scheme. *Id.* ¶ 92.

Like Dr. Sami and Dr. Khan, Dr. Qureshi did not practice medicine through Excel. *Id.* ¶ 94. As an internist, Dr. Qureshi has no experience in providing the radiology services offered by the corporation. *Id.*

In mid-2010, Dr. Sami and Dr. Khan sought to withdraw. *Id.* ¶ 95. Amanat and Ilahi arranged for them to transfer their ownership interests in Excel to Dr. Qureshi for a nominal price. *Id.* ¶¶ 97-98.

In mid-2011, the Management Defendants recruited a Virginia radiologist, Dr. Imam, to join the scheme as another nominal owner of Excel. *Id.* ¶¶ 98-99. The transfer of the shares occurred under circumstances similar to the previous transfers. *Id.* ¶¶ 100-104. As before, the transaction did not alter Excel's operations, or the degree of control by the Management Defendants. *Id.* ¶ 105-110.

Like the other Nominal Owner Defendants, Dr. Imam did not actually practice medicine through Excel and continued to reside in Virginia. *Id.* ¶ 111. Moreover, Dr. Imam was involved

14

in numerous out-of-state business ventures that prevented him from practicing medicine through Excel. *Id.* ¶ 112.

Many of the healthcare services provided by Excel were performed by independent contractors. *Id.* ¶ 127. Bills submitted by the corporation included charges for services by non-owner radiologists, including Dr. Paul Bonheim, Dr. Sasan Azar a/k/a/ Azar Sasan, Dr. Michael Green, Dr. Mark Shapiro, Dr. Ron Mark, Dr. Robert Solomon, and Dr. John Rigney. *Id.* During the same period, these physicians also billed plaintiffs for work done on behalf of other corporations. *Id.* Plaintiffs allege that, although these radiologists were nominally employees of Excel, they did not act as employees ordinarily would. For example, they did not provide their services at Excel's offices. *Id.* ¶ 128. Instead, they set their own hours, provided these services at their own offices using their own equipment and tools, and were not supervised in any way by Excel or its nominal owners. *Id.* ¶¶ 128-29. Excel paid these radiologists using tax forms designated for independent contractors; provided them with no benefits; and required them to carry their own malpractice insurance. *Id.* ¶ 135. By using these techniques, they received significant economic benefits—by, for example, avoiding taxes, eliminating the need to buy malpractice insurance, and avoiding potential liability. *Id.* ¶ 136.

Plaintiffs allege that defendants routinely misrepresented in its bills and NF-3 forms that: 1) Excel was lawfully licensed; and 2) the services billed for were provided by Excel, not independent contractors. *Id.* ¶ 139. These documents were submitted to plaintiffs through the mail. In reliance on these facially-valid documents, and in order to comply with its statutory and contractual obligations to process claims within 30 days, Liberty Mutual has paid defendants more than $471,000 in no-fault reimbursements since 2003. *Id.* ¶ 145. Unpaid bills for an additional $756,000 have been submitted. *Id.* ¶ 148.

Plaintiffs recently made formal requests for additional verification that Excel is operating lawfully, including an examination under oath, as permitted by New York's no-fault laws. *Id.* ¶ 143. Defendants have not acceded to these requests. *Id.*

### D.  **Prior Litigation**

In the past, when plaintiffs have failed to pay the charges billed for in full, defendants have sued them. *Id.* ¶ 144. Sometime prior to November 2004, Excel filed a claim for failure to pay no-fault benefits against the plaintiffs in Queens County Civil Court. In November 2004, plaintiffs filed a verified answer, asserting as affirmative defenses: 1) that the treatment was actually performed by independent contractors; and 2) that Excel "engaged in providing fraudulent statements and/or fraudulent conduct." Def. Mark D. Freilich's Mem. in Supp. of His Mot. to Dismiss Ex. A (Ans., *Excel Imaging, P.C. Assignee of Robert Gazneli v. Liberty Mutual Ins. Co.* (Queens Cnty. Civ. Ct. 2004)), Doc. Entry 22, Feb. 13, 2012.

Defendants continue to sue Liberty Mutual for failure to pay outstanding claims. To date, Excel has filed 542 lawsuits in New York State courts against plaintiffs, 120 of which are still pending. Aff. of Thomas Brosnan in Supp. of Plaintiffs' Opp. to Defs.' Mot. ¶ 4, Doc Entry 54, May 21, 2012. They have never requested arbitration of any claim against Liberty Mutual. *Id.* ¶ 5.

Prior to the commencement of this action, no other insurance company had filed an affirmative fraud recovery action against Excel. Aff. of James Beadle in Supp. of Pls.' Opp. to Defs.' Mots ¶ 12, Doc. Entry 53, May 21, 2012.

16

E. **Investigation of Excel**

Liberty Mutual began investigating Excel in March 2011 after a 2010 investigation into an unrelated healthcare provider uncovered the fact that one of the company's reading radiologists, Dr. Mark Shapiro, was also involved in other suspect MRI clinics. *Id.* ¶ 5. In July 2010, a limited background review of Excel revealed that Kings Highway had operated from the same location as Excel; that the alleged owner of Kings Highway had surrendered his medical license; and that non-physician management personnel were associated with the practice. *Id.* ¶ 5. When an investigator, James Beadle, tried to visit Excel to speak to Dr. Shapiro in July 2010, the front desk staffer refused to let him into the office and declined to answer any questions. *Id.* ¶ 6. In August 2010, Beadle noted that Excel was a candidate for investigation. *Id.* ¶ 7.

Plaintiffs first opened a full investigation into Excel in March 2011. *Id.* ¶ 9. At that time, Liberty Mutual became aware of the facts underlying the instant case. *Id.* ¶¶ 9-10. Some months later, their investigator obtained the transcript of Dr. Freilich's 2003 examination under oath. *Id.* ¶ 10.

III.   **Procedural History**

Plaintiffs filed their complaint on November 23, 2011. Defendants moved to dismiss the complaint on a variety of grounds, including expiration of the statute of limitations and failure to state a claim; they also moved to compel arbitration. *See* Non-Freilich Defs. Mem. of L., Doc. Entry 21, Feb. 3, 2012; Def. Mark D. Freilich's Mem. in Supp. of His Mot. to Dismiss, Doc. Entry 22, Feb. 13, 2012. Defendants' motions were converted by the court to ones for summary judgment. *See* Order, Doc. Entry 38, Apr. 13, 2012. The parties stipulated that the pending motions for summary judgment would be limited to issues of the statutes of limitations and the

17

motion to compel arbitration so that further discovery would not delay decision.  Stipulation, Doc. Entry 48, May 3, 2012.

IV.  **Jurisdiction**

In order for a federal court to have diversity jurisdiction over a claim, there must be complete diversity between the plaintiffs and the defendants.  *E.g.* 28 U.S.C. § 1332.  Plaintiff corporations are "citizen[s] of every State and foreign state by which [they] ha[ve] been incorporated and of the State or foreign state where [they] ha[ve] [their] principal place of business."  28 U.S.C. § 1332(c)(1).  Plaintiffs Liberty Insurance Corporation, the First Liberty Insurance Corporation, and LM Insurance Corporation are Illinois corporations and thus are citizens of that state.  *Id.* ¶ 8.  Defendant Dr. Sami is also a citizen of Illinois.  *Id.* ¶ 18.  There is not complete diversity among the parties.

There is federal question jurisdiction over plaintiff's RICO claims.  *See* 28 U.S.C. § 1331.  Supplemental jurisdiction is exercised over plaintiffs' state law claims.  These claims arise from the same underlying conduct as the federal claims; they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367.

V.  **Legal Standards**

As agreed upon by the parties, defendants' contentions regarding the statute of limitations and arbitration will be treated as motions for summary judgment.  Defendants' remaining motions will be decided as motions to dismiss on the pleadings.

18

### A. **Motion to Dismiss**

Rule 12(b)(6) allows dismissal of claims when the pleadings fail "to state a claim upon which relief can be granted." In ruling on a 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). While plaintiffs are not required to put forward "detailed factual allegations," a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2006). A claim survives a motion to dismiss if it is "plausible on its face." *Id.* at 570. By contrast, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996), *cert. denied* 519 U.S. 1007 (1996).

The Federal Rules of Civil Procedure impose a more stringent particularity requirement on "all averments of fraud or mistake" than it does on other claims. Fed. Rule Civ. P. 9(b). In order to comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

### B. **Summary Judgment**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and if the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986); *see also Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999).  In ruling on a motion for summary judgment, the evidence must be construed in the light most favorable to the non-moving party and all reasonable inferences drawn in its favor.  Fed. R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 247–50, 255; *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the moving party appears to have met this burden, the opposing party must produce evidence that raises a question of material fact to defeat the motion.  *See* Fed. R. Civ. P. 56(e).  This evidence may not consist of "mere conclusory allegations, speculation or conjecture."  *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also Delaware & Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("Conclusory allegations will not suffice to create a genuine issue.").

## VI.    Motion to Compel Arbitration

### A.  Right to Arbitrate No-Fault Claims

Defendants argue that plaintiffs must give them the opportunity to arbitrate the claims against them before bringing suit.  On its face, New York's No-Fault Insurance Law grants the claimant a broad right to proceed through arbitration rather than litigation:

> *Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits*, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section *to arbitration* pursuant to simplified procedures to be promulgated or approved by the superintendent.

N.Y. Ins. Law § 5106(b) (emphasis added); *see* Part VIII(A)(1), *infra* (discussing viability of insurers' fraud and unjust enrichment claims).  Courts have interpreted this provision as requiring "insurers to submit to binding arbitration of no-fault claims at the option of the claimant." *E.g. Nyack Hosp. v. Government Employees Ins. Co.*, 526 N.Y.S.2d 614, 615 (2d Dep't 1988).  When this option is exercised, arbitration is compulsory.  *See, e.g., Furstenberg v. Allstate Ins. Co.*, 403 N.E.2d 170, 171 (N.Y. 1980) (stating that insurer "was obliged under the statute to accept the arbitral forum for the resolution of the claim against it").

In *Allstate Ins. Co. v. Lyons*, as here, a sued medical services corporation raised their right to arbitration in lieu of litigation as an affirmative defense. --- F.Supp.2d ----, 2012 WL 517600 (E.D.N.Y. 2012) (Gleeson, J.); *see also Allstate Ins. Co. v. Khaimov*, No. 11–CV–2391, 2012 WL 664771, at *3 (E.D.N.Y. Feb. 29, 2012) (Gleeson, J.) (relying on *Lyons* to find that Insurance Law § 5106(b) "does not reach affirmative claims by insurance companies to recover payments already made to claimants on the ground of fraud").  After extensive analysis of the text of the statute, its purpose, and relevant case law, Judge Gleeson concluded that section 5106(b) permits claimants to compel arbitration for claims not yet paid. *Lyons,* 2012 WL 517600, at *16.  It does not permit a medical services corporation to demand arbitration for claims already paid to which the corporation was not entitled to due to its fraudulent incorporation. *See id.* at *15.  *But see Countrywide Ins. Co. v. DHD Medical, P.C.*, 926 N.Y.S.2d 293, 293 (1st Dep't 2011) (denying motion by insurers for a stay pending arbitration proceeding, granting medical services corporation's motion to dismiss the suit, and holding that claim of fraudulent incorporation did not preclude medical services corporation from demanding arbitration pursuant to Insurance Law section 5106(b), since "the defense

of fraudulent incorporation is for the arbitrator and not for the courts" (internal citations and quotations omitted)).

### B. Waiver of Right to Arbitration

Plaintiffs' contend that, even if *Lyons* is followed, defendants have waived their right to arbitration by filing suit against Liberty Mutual for the unpaid no-fault benefits now at issue.

Defendants' right to arbitrate is a creation of state no-fault law. Defendants' have presented no evidence that the Liberty Mutual insurance contracts bargained for the right to arbitrate affirmative fraud claims through their private agreements. As a result, New York law, rather than the Federal Arbitration Act, applies to determine whether the defendants have waived their arbitration rights. *See* 9 U.S.C. § 2 ("A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."); *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 130 S.Ct. 2847, 2859–60 (2010) (holding that courts should "appl[y] the presumption favoring arbitration, in FAA . . . cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that *arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate* was validly formed and . . . is legally enforceable and best construed to encompass the dispute" (emphasis added); *Lyons,* 2012 WL 517600, at *15 (determining that the Federal Arbitration Act does not compel application of

presumption in favor of arbitration, since the right to arbitrate disputes over New York no-fault reimbursement is a creation of state law).

Under New York law, a party commencing an action will be assumed to have waived its right to arbitration when its use of the judicial process is "clearly inconsistent" with seeking arbitration at a later date. *Stark v. Molod Spitz DeSantis & Stark, P.C.*, 876 N.E.2d 903, 908 (2007) (internal citations and quotations omitted). "[W]here the defendant's participation in the lawsuit manifests an affirmative acceptance of the judicial forum, with whatever advantages it may offer in the particular case, his actions are then inconsistent with a later claim that only the arbitral forum is satisfactory. " *Id.* (internal citations and quotations omitted).  New York courts have held that "an election to arbitrate should foreclose litigation of subsequent disputes over medical bills growing out of the same accident." *Roggio v. Nationwide Mut. Ins. Co.*, 487 N.E.2d 261, 263 (N.Y. 1985).  Conversely, choosing to file a claim in court rather than arbitrate constitutes a waiver of the right to arbitrate. *E.g. Digitronics Inventioneering Corp. v Jameson*, 860 N.Y.S.2d 303, 303 (3d Dep't 2008).

## C. **Arbitration Stayed Pending Resolution of this Case**

The interpretation of Insurance Law § 5106(b) as outlined in *Lyons* is adopted.  The defendants may not compel plaintiffs to arbitrate claims already paid.  Moreover, in the instant case, defendants chose to file suit in state court against Liberty Mutual to recover for unpaid claims knowing that they had the option to arbitrate these claims.  They have thus waived the right to demand arbitration of those claims.

To the extent that defendants have not yet sued on any unpaid claims, they may compel arbitration of those claims.  Permitting these individual claims to proceed to arbitration while

their claim for a declaratory judgment remains pending in this court puts the plaintiffs at significant risk of multiple judgments that may be inconsistent with the ultimate decision in this case. In the interests of judicial economy, arbitration of such unpaid claims is stayed pending a decision in the present case.

## VII.   Statute of Limitations

Defendants allege that plaintiffs' federal RICO and state law fraud and unjust enrichment claims are time-barred because plaintiffs were aware of facts that put them on inquiry notice of the fraud years prior to the filing of the complaint. Because a genuine issue of fact exists as to when plaintiffs were on notice of the scheme, and whether they were misled by defendants' efforts to conceal the fraud, defendants' motion is denied.

### A. RICO Claims

#### 1. Generally

"Civil RICO claims are subject to a four-year statute of limitations." *Rotella v. Wood,* 528 U.S. 549, 552 (2000). The statute of limitations "begins to run when the plaintiff discovers—or should have reasonably discovered—the alleged injury." *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 233 (2d Cir. 2008).

#### 2. Separate Accrual

The Court of Appeals for the Second Circuit has recognized that "in some instances a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries which each have separate limitations periods." *In re Merrill Lynch Ltd.*

24

*Partnerships Litigation,* 154 F.3d 56, 59 (2d Cir. 1998) (citing *Bingham v. Zolt,* 66 F.3d 553, 559-61 (2d Cir. 1995)), *cert. denied,* 517 U.S. 1134 (1996)). Under this "separate accrual" rule, "a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *In re Merrill Lynch,* 154 F.3d at 59.

> A necessary corollary of the separate accrual rule is that a plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought . . . . As long as separate and independent injuries flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year window before suit was filed, together, of course, with any provable future damages.

*Bingham,* 66 F.3d at 560 (citing *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir. 1988), *cert. denied,* 490 U.S. 1007 (1989)).

In *Banker's Trust Co.,* for example, officers of a bankrupt corporation fraudulently concealed assets of the bankruptcy estate through a complicated series of transactions and instituted frivolous lawsuits against plaintiffs to prevent them from recovering a legitimate debt. *See* 859 F.2d 1096, 1098–99 (2d Cir. 1988). The Court of Appeals for the Second Circuit held that the various legal fees and expenses incurred by the plaintiffs over time were separate injuries from the loss of the debt itself, and each separately subject to the statute of limitations. *Id.* at 1103.

Similarly, in *Bingham v. Zolt,* the New York Court of Appeals held that, where the defendants made "frequent misappropriations of discrete amounts of money from different sources, "each illegal diversion constituted a new and independent legally cognizable injury to [plaintiff's] estate" with its own statute of limitations. 66 F.3d at 561. These injuries were caused by a variety of schemes which were related only in their ultimate goal. *Id.* at 559-61.

25

By contrast, in *In re Merrill Lynch Ltd. Partnerships Litigation*, the Court of Appeals for the Second Circuit found that the separate accrual rule did not apply where defendants' "limited partnership scheme was fraudulent at the outset." 154 F.3d at 59. Because "Merrill Lynch knew that the investments could not make the 'guaranteed' gains, and planned to collect significant fees during the course of the partnership life," neither "later communications which put a gloss on the losing investments" nor "the collection of annual fees occurred in each year of the life of the partnerships" were new and independent injuries. *Id.* at 59-60. These acts were "simply a part of the alleged scheme" or "were continuing efforts to conceal the initial fraud, and not separate and distinct fraudulent acts resulting in new and independent injuries." *Id.* The statute of limitations for the continuing unlawful scheme accrued at the first moment the plaintiff did or could have discovered that scheme, even though scheme continued beyond that date. *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d at 59-60.

### B. State Law Claims

Defendants claim that plaintiffs' claims for fraud and unjust enrichment are time-barred because they are a creation of New York statutory law and thus subject to a three-year statute of limitations under New York Civil Practice Law and Rules § 214(2). Plaintiffs' allege that a six-year statute of limitations applies to these claims. CPLR 213(8) (stating that a fraud action must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it"); CPLR 213(1). *Id.* ("The following actions must be commenced within six years: . . . an action for which no limitation is specifically prescribed by law.").

26

Because New York's no-fault laws substantively altered defendants' liability for common law fraud and unjust enrichment, CPLR 214(2) applies to those claims.

### 1. Statute of Limitations for Duties Imposed by Statute

Section 214(2) establishes a three-year statute of limitations for "an action to recover upon a liability, penalty or forfeiture created or imposed by statute except as provided in sections 213 and 215." "The phrase 'except as provided in sections 213 and 215' has reference to subdivision 7 of CPLR 213 and subdivision 4 of CPLR 215," Harold L. Korn, Arthur Miller, et al., New York Civil Practice ¶ 214.03, which do not apply in this case.

"CPLR 214(2) does not automatically apply to all causes of action in which a statutory remedy is sought, but only where liability would not exist but for a statute." *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082 (N.Y. 2001) (internal citations and quotations omitted). As the New York Court of Appeals has explained, "[CPLR 214(2)] does not apply to liabilities existing at common law which have been recognized or implemented by statute. Thus, if the statutory lien merely codifies or implements an existing liability, the three-year statute would be inapplicable." *Aetna Life & Cas. Co. v. Nelson*, 492 N.E.2d 386, 388 (N.Y. 1986) (internal citations omitted). By contrast, in "claims which, *although akin* to common-law causes, *would not exist but for the statute* . . . CPLR 214(2) applies." *Matter of Motor Vehicle Acc. Indem. Corp. v. Aetna Cas. & Sur. Co.*, 674 N.E.2d 1349, 1352 (N.Y. 1996) (emphasis added). It is insufficient to bring a claim within the ambit of § 214(2) if the statute merely enlarges the common-law scheme of liability or grants additional remedies. *State v. Cortelle Corp.*, 341 N.E.2d 223, 224-25 (N.Y. 1975). "A proper test of whether a particular liability is one that was created by statute is to determine whether the liability is a governmental statutory denouncement

27

of a human action heretofore undenounced." *Hartnett v. N.Y.C. Transit Auth.*, 657 N.E.2d 773,

777 (N.Y. 1995) (internal citations and quotations omitted).

Where a statute merely "expand[s] the definition of fraud so as to create new liability in

some instances," CPLR 214(2) does not apply. *New York v. Bronxville Glen I Assoc.*, 581

N.Y.S.2d 189, 189 (1st Dep't 1992) (holding that CPLR 214(2) does not apply to claims of

investor fraud; "[b]ecause the [statute] did not create a liability nonexistent at common law . . .

the creation of additional penalties does not automatically bring a statutory cause of action within

the three-year statute of limitations unless that new penalty imposes liability where previously

there was none"). *See also Orr v. Kinderhill Corp.*, 991 F.2d 31, 34 (2d Cir. 1993) ("When

Debtor & Creditor Law § 273-a was enacted . . . , the liability it imposed [for fraudulent

conveyance] was not novel. . . . Section 273-a simply fleshed out the meaning of a fraudulent

conveyance by stigmatizing certain conveyances made during litigation. Thus, CPLR § 214(2)

does not apply to actions under Debtor & Creditor Law § 273-a.").

In *Cortelle*, for example, one defendant, a Mr. Berlin, was accused of making willful

misrepresentations to induce the transfer of property to him. 341 N.E.2d at 224. The New York

Attorney General brought suit under New York Executive Law § 63(12), which provided in

relevant part:

> Whenever any person shall engage in repeated fraudulent or illegal acts or
> otherwise demonstrate persistent fraud or illegality in the carrying on, conducting
> or transaction of business, the attorney-general may apply, in the name of the
> people of the state of New York, to the supreme court of the state of New York . .
> . for an order enjoining the continuance of such business activity or of any
> fraudulent or illegal acts, directing restitution . . . . The word 'fraud' or
> 'fraudulent' as used herein shall include any device, scheme or artifice to defraud
> and any deception, misrepresentation, concealment, suppression, false preten[s]e,
> false promise or unconscionable contractual provisions.

28

N.Y. Exec. Law § 63(12).  Defendants argued that CPLR 214(2) applied to the claim, rendering

them time-barred.  341 N.E.2d at 224.  The New York Court of Appeals disagreed.

> As applied to the allegations in this case, [the statute] create[s] no new claims but
> only provide[s] particular remedies and standing in a public officer to seek redress
> on behalf of the State and others. Moreover, *the kind of wrong the Attorney-*
> *General seeks to redress is not a new one to the decisional law but a now rather*
> *old and common type of fraud.* . . . While this provision may in part expand the
> definition of fraud so as to create a new liability in some instances, *it also*
> *incorporates already existing standards applied to fraudulent behavior always*
> *recognized as such.* . . . [D]efendants' alleged actions are and were wrongful prior
> to and independent of the Executive Law.

*Id.* at 225 (emphasis added).

By contrast, in *Gaidon,* the New York Court of Appeals found that, although New York

General Business Law § 349 "cover[ed] conduct 'akin' to common-law fraud," suits brought

under that statute were subject to CPLR 214(2).  750 N.E.2d at 1082.  The court explained that

the liabilities imposed by section 349 were different from common-law fraud in several critical

ways, since the statute did not require proof of scienter and outlawed conduct that did not

necessarily rise to the level of fraud.  *Id.* at 1083.  Since the statute "encompasse[d] a

significantly wider range of deceptive business practices that were never previously condemned

by decisional law," actions brought under it were subject to the three-year statute of limitations.

*Id.*

Courts have found that some actions brought under New York's no-fault laws are

governed by CPLR 214(2).  The New York Court of Appeals has stated broadly that "the No-

Fault Law does not codify common-law principles; it creates new and independent statutory

rights and obligations in order to provide a more efficient means for adjusting financial

responsibilities arising out of automobile accidents." *Nelson*, 492 N.E.2d at 389.  Unlike

common law, which relies on findings of fault to allocate responsibility, under no-fault the

29

"ability to recover benefit payments and its duty to pay the same rests on 'predicates independent
of the fault or negligence of the injured party.'" *Motor Vehicle Acc. Indemnification Corp. v.
Aetna Cas. & Sur. Co.*, 674 N.E.2d 1349, 1352 (N.Y. 1996) (citing *Nelson*, 492 N.E.2d at 389).
It thus held that an insurance company's ability to assert a lien against any recovery obtained by
the insured from the tortfeasor was governed by CPLR 214(2)'s three year statute of limitations.
*Nelson*, 492 N.E.2d at 389.  While the right to recoupment being pursued by Aetna Life in
*Nelson* had some equivalent at common law, the court held that it was "made available to [it]" by
New York's no-fault laws, as "first-party benefits [permitting recovery without a finding of fault]
are a form of compensation unknown at common law." *Id.*; *see also Motor Vehicle Acc.
Indemnification Corp.*, 674 N.E.2d at 1352 (holding that CPLR § 214(2) applies to a cause of
action to recover payments of first-party benefits by the Motor Vehicle Accident Indemnification
Corporation, a statutorily created body, against the insurer of a vehicle who denied no-
fault coverage). *But see Allstate Ins. Co. v. Stein*, 807 N.E.2d 268, 271-72 (N.Y. 2004) (holding
that an insurer's action to recover from the tortfeasor amounts paid by the insurer in additional
personal injury protection benefits above and beyond those mandated by no-fault law is not
properly analyzed under CPLR § 214(2); because the benefits were contractual, not required by
statute, the claim was properly analyzed as one for subrogation); *Gurnee v. Aetna Life & Cas.
Co.*, 433 N.E.2d 128, 131 (N.Y. 1982), *cert. denied* 459 U.S. 837 (applying six-year statute of
limitations provided by  CPLR § 213 to an insured's cause of action against an insurance
company for wrongfully withheld first-party benefits because the benefits were required by
contract); *Mandarino v. Travelers Property Cas. Ins. Co.*, 831 N.Y.S.2d 452, 454-55 (2d Dep't
2007) (holding the same).

While some courts have applied a six-year statute of limitations to claims seeking to deny

or recoup no-fault payments from medical services corporations due to their fraudulent

incorporation, they have done so without considering whether CPLR 214(2) might apply. *See*

*State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 104 (E.D.N.Y. 2010) (applying

six year statute of limitations to similar claims by insurers for unjust enrichment due to no-fault

fraud); *St. Paul Travelers Ins. Co. v. Nandi*, No. 24107/06, 841 N.Y.S.2d 823 (table), 2007 WL

1662050, at *7 (Queens Cnty. Sup. Ct. May 25, 2007) (same).

### 2. Claims Subject to Three-Year Statute of Limitations

As a general matter, causes of action for fraud and unjust enrichment existed at common

law and are not a creation of the no-fault statute. Defendants contend, however, that prior to the

passage of New York's no-fault laws and the promulgation of its attendant regulations, the fact

that medical services were provided by independent contractors or at an inappropriately

constituted medical corporation would not have permitted plaintiffs to cover under their unjust

enrichment or fraud theories.

At common law, in some cases, an unlicensed provider could be denied compensation for

services for which a regulatory license is required. *Compare, e.g., Spivak v. Sachs*, 211 N.E.2d

329, 331 (1965) (holding that an attorney admitted to the bar in California but not in New York

may not recover for services rendered in New York); *Bendell v. De Dominicis*, 167 N.E. 452,

453-54 (N.Y. 1929) (holding that an unlicensed real estate broker may not recover for

commissions owed); *with, e.g., Benjamin v. Koeppel*, 650 N.E.2d 829, 832 (N.Y. 1995) (holding

that attorney, who was admitted to the bar but had not complied with statutory requirement to

register with the Office of Court Administration, could nonetheless recover payment from law

31

firm pursuant to fee-sharing agreement for legal services rendered during period of
noncompliance; payment may be refused only "where the [licensing] statute looks beyond the
question of revenue and has for its purpose the protection of public health or morals or the
prevention of fraud, [since] non-compliance with its terms would affect the legality of the
business" (internal citations and quotations omitted)).  Improper licensing generally did not
permit recovery of the fee by the payer after payment. *E.g. Johnston v. Dahlgren,* 59 N.E. 987,
988 (N.Y. 1901) (holding that, while plaintiff plumbers "were disabled from compelling
payment for work performed by them in violation of the statute, the defendant had the benefit of
the work they had performed and having paid for it," defendant's payment could not be taken
back); *see also Schank v. Schuchman,* 106 N.E. 127, 129 (1914) (Cardozo, J.) ("If the defendant
were suing the plaintiffs for the price, and the court were to deny him relief, its refusal would not
rest upon the ground that it would be against good conscience for him to have the money. The
basis of its refusal would rather be that because of his illegal acts the law would leave him where
it found him . . . . In this case it finds him in a situation altogether different. He has received the
money, and the plaintiffs are trying to take it away from him. The law may at times refuse to aid
a wrongdoer in getting that which good conscience permits him to receive; it will not for that
reason aid another in taking away from him that which good conscience entitles him to retain.").
Thus "a cause of action by an insurance carrier [for fraudulent incorporation] sounding in fraud
or unjust enrichment would not lie" at common law. *Metroscan Imaging, P.C. v. Geico Ins.
Co.,* 823 N.Y.S.2d 818, 821 (N.Y. Sup. App. Term 2006).

Courts have held that "the promulgation of 11 NYCRR 65-3.16 (a) (12) by the
Superintendent of Insurance altered the common law prospectively so that an insurance carrier
may maintain a cause of action against a fraudulently incorporated medical service corporation

32

to recover assigned first-party no-fault benefits which were paid by the insurer to such medical service corporation after the regulation's effective date." *Id.* This regulation altered the general common law rule, permitting insurers to recover payments already made to fraudulently incorporated medical services corporations under unjust enrichment and fraud theories. *See* Part VIII(A)(1), *infra.*

Plaintiffs' causes of action for fraud and unjust enrichment to recover for payments already made would not be cognizable under New York law but for 11 N.Y. Comp. Code R. & Reg. tit. 65, § 3.16(a)(12). The shorter, three-year statute of limitations for liabilities created by statute applies to these claims.

### C. Equitable Estoppel

Equitable estoppel applies to bar a statute of limitations defense "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 377 N.E.2d 713, 716 (1978); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997); *Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir. 1979). Under New York law, the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations. *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006). Similarly, in the context of civil RICO claims, plaintiffs must demonstrate that they acted with reasonable diligence. *Klehr*, 521 U.S. at 194. "It is therefore fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." *Zumpano,* 849 N.E.2d at 929.

Only if the jury finds that plaintiffs' claims are barred by the statute of limitations will equitable tolling be considered. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 508

33

(1959) (holding that, where suit raises both legal and equitable issues, legal issues must be tried to a jury before resolution of any equitable issues by the court).

### D. Issues of Fact as to When Plaintiffs Could Have Discovered the Fraud

Issues of fact as to when plaintiffs should have discovered the fraud preclude summary judgment on statute of limitations grounds.

Where it is possible to draw conflicting inferences about when plaintiffs were on notice of the fraud complained of, the issue cannot be determined as a matter of law. *See, e.g., Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir. 1979); *Huang v. Sentinel Gov't Securities,* 709 F. Supp. 1290, 1301 (S.D.N.Y. 1989) (holding that the court may determine as a matter of law when a claim should have been discovered only when "uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct"); *cf. Bingham,* 66 F.3d at 558 (noting that the jury was asked to determine "when the estate actually knew of defendants' alleged wrongful acts").

Defendants claim that the plaintiffs were on inquiry notice of the fraud as early as 2003. They rely on a number of facts, both public and private, that allegedly should have alerted the plaintiffs to the ongoing scheme:

- In 2003, the predecessor to Excel, Kings Highway, was under investigation by the insurance industry. That same year, in a proceeding initiated by another insurance company, Dr. Freilich testified that Excel existed only for billing purposes and that his relationship with the Management Defendants was the same as that under Kings Highway.
- In 2005, Dr. Ginde, the owner of Kings Highway, was disciplined by the New York Board of Medical Examiners.
- In 2006 and 2007, respectively, Dr. Freilich was disciplined by the New Jersey and New York Boards of Medical Examiners.
- In 2007, Kings Highway's certificate of incorporation was revoked.

34

The records of these disciplinary actions, as well as records of incorporation, are public.

Defendants further argue that there is direct proof that the plaintiffs were aware of the fraud before the applicable limitations period. In plaintiffs' November 2004 answer to a claim filed by Excel in state court, they asserted: 1) that the medical services were actually performed by independent contractors; and 2) that Excel "engaged in providing fraudulent statements and/or fraudulent conduct." Def. Mark D. Freilich's Mem. in Supp. of His Mot. to Dismiss Ex. A (Ans., *Excel Imaging, P.C. v. Liberty Mutual Ins. Co.* (Queens Cnty. Civ. Ct. 2004)), Doc. Entry 22, Feb. 13, 2012. Defendants contend that, by this date at the latest, plaintiffs were on notice that Excel was committing fraud. This pleading is part of the record in the instant case and may be considered as evidence of Liberty Mutual's knowledge of defendants' alleged fraud, although not for the truth of the allegations themselves.

Plaintiffs claim that they were not aware of the fraud until shortly before they filed the complaint in this matter. They allege they did not discover the relationship between Kings Highway and Excel until 2010, and that they were not aware of other facts relevant to its claim of fraud, including Dr. Freilich's examination under oath, until 2011. They cite the significant efforts that Excel undertook to conceal the fraud, including frequently changing its nominal owners, submitting facially valid bills, and pursuing compensation for unpaid bills through state court litigation. These efforts, they contend, frustrated their ability to uncover the fraud.

A genuine issue of material fact exists as to when plaintiffs became aware of the fraud, and whether they are entitled to equitable estoppel. The uncontradicted affidavit of Beadle, Liberty Mutual's investigator, establishes that plaintiffs were not aware of Dr. Freilich's 2003

35

deposition testimony until 2011.  Nor is there any indication that plaintiffs could have uncovered this deposition, taken by an unrelated insurance company, at an earlier date.

While plaintiffs could have located the public records of the disciplinary proceedings against Dr. Ginde and Dr. Freilich, and of the revocation of Kings Highways' corporate status, knowledge of these facts may not have been sufficient to alert plaintiffs to the existence of fraud. Dr. Freilich was disciplined for negligent interpretation of MRIs and for permitting his name to be used improperly on the letterhead of a New Jersey professional services corporation.  Nothing in the proceedings indicated that Dr. Freilich's relationship with Excel was fraudulent, or would have adverted the plaintiffs' to the existence of the larger scheme.  Similarly, the charges against Dr. Ginde were related to negligent interpretation of MRIs, not fraud.  Moreover, there is no indication that plaintiffs were aware of the connection between Kings Highway, where Dr. Ginde worked, and Excel until Beadle began investigating in 2010.

The allegations in Liberty Mutual's 2004 answer are in the nature of formulaic defenses, and may not necessarily indicate sufficient knowledge of the fraud.

An additional question exists as to when Beadle's suspicions about Excel could be imputed to the corporate plaintiffs as knowledge.  In general, "[c]orporations can only act through their officers and employees, and in a proper case the acts and knowledge of the employee are imputed to the corporation." *Koam Produce, Inc. v. DiMare Homestead, Inc.,* 213 F. Supp. 2d 314, 325-26 (S.D. N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003).

> An organization's large size does not in itself defeat imputation, nor does the fact that an organization has structured itself internally into separate departments or divisions. Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information.

36

Restatement (Third) Of Agency § 5.03 (2006).

In cases involving fraud, it may be desirable to depart—sometimes, in appropriate

cases—from this rule of automatic imputation of knowledge for two policy reasons.  First,

imputing all knowledge of any employee to the corporation could encourage corporations to sue

as soon as they have a scintilla of evidence of fraud in order to avoid running afoul of the statute

of limitations, leading to unnecessary litigation.  Second, to avoid a statute of limitations defense

on a potential fraud claim, corporations may avoid investigating possibly suspicious activities.

*But see Peach Parking Corp. v. 346 West 40th Street, LLC*, 835 N.Y.S.2d 172, 176  (1st Dep't

2007) (holding, in case claiming undisclosed structural issues and defaults in the over-leases of

building, that "allegations of 'material misrepresentations' are not actionable, because

[plaintiff's] own employees were on notice of the" purportedly hidden defects).

Finally, in this case, there is ample direct and indirect evidence of continuing cover-ups

of the fraud by defendants.  A jury could find that plaintiffs did not discover the fraud because of

defendants' conduct.  Equitable estoppel may thus provide an independent basis for not

dismissing the suit on the ground of the statute of limitations.

Defendants' motions for summary judgment are denied.

VIII.    **Failure to State a Claim**

Defendants move to dismiss plaintiffs' complaint on several grounds.  The Non-Freilich

Defendants claim that plaintiffs' have failed to adequately state a claim for RICO conspiracy,

and that they have not adequately alleged an enterprise that is distinct from the pattern of

racketeering activity, causing their substantive RICO claims to fail.   They also claim that

37

plaintiffs have failed to plead fraud with sufficient particularity.  Dr. Freilich claims that plaintiffs' unjust enrichment claims fail as a matter of law.  These claims are without merit.

### A. State Law Causes of Action

Defendants argue that plaintiffs' state law causes of action must be dismissed because plaintiffs cannot recover for fees already paid to fraudulently incorporated medical services corporations and because they have failed to plead fraud with particularity.  These claims are meritless.

#### 1. Ability to Recover Fees Paid to Fraudulently Incorporated Medical Services Corporations

"[U]nder [New York's] 'no-fault' insurance laws, insurance carriers may withhold payment for medical services provided by fraudulently incorporated enterprises to which patients have assigned their claims." *Mallela*, 827 N.E.2d at 759; *see also* 11 N.Y. Comp. Codes R. & Regs. tit. 65, § 3.16(a)(12).

It is less clear whether an insurer can sue fraudulently incorporated corporations under theories of fraud or unjust enrichment to recover for payments already made. *See* Part VII(B)(2), *supra* (discussing availability of these claims under common law); *cf.* Part VI, *supra* (discussing right to arbitrate these claims).  In *Mallela,* an insurer sued a medical services corporation that was allegedly structured in a similar fashion to Excel. *Mallela*, 827 N.E.2d at 759. The New York Court of Appeals found that, if these allegations were taken as true, the medical services corporation was not entitled to no-fault payments. *Id*. While it held that an insurer could not recover payments already made to fraudulently incorporated medical services corporations

38

before April 4, 2002, the effective date of the regulation, under common law theories of fraud or unjust enrichment, it declined to rule on whether an insurer could sue to recover payments made after the regulation went into effect. *Id.* at 761.

Although neither the New York Court of Appeals nor the Court of Appeals for the Second Circuit has ruled on the issue, numerous lower courts have subsequently relied on *Mallela* to hold that an insurer can "bring an action for fraud or unjust enrichment, based on fraudulent incorporation, to recover payments *already made* to fraudulently incorporated providers, so long as the payments were made after April 4, 2002, the effective date of the regulation." *State Farm Mut. Auto Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 221 (E.D.N.Y. 2009) (emphasis in original); *see also Allstate Ins. Co. v. Bogoraz*, 818 F. Supp. 2d 544, 549 (E.D.N.Y. 2011); *Rabiner,* 749 F. Supp. 2d at 103; *State Farm Mut. Auto. Ins. Co. v. CPT Med. Svcs., P.C.,* No. 04–CV–5045, 2008 WL 4146190, at *8–*9 (E.D.N.Y. Sep. 5, 2008); *One Beacon Ins. Group, LLC v. Midland Medical Care, P.C.*, 863 N.Y.S.2d 728, 729 (2d Dep't 2008); *Belt Parkway Imaging, P.C.*, 823 N.Y.S.2d at 10-11; *Metroscan Imaging, P.C.,* 823 N.Y.S.2d at 821; *see generally Lyons,* 2012 WL 517600 (accepting that plaintiff insurance companies may recover against fraudulently incorporated medical services corporations for fraud and unjust enrichment). No case was found holding to the contrary.

The overwhelming weight of persuasive New York authority will be followed. Plaintiffs may seek to recover against the defendants under theories of fraud and unjust enrichment solely on the basis of Excel's fraudulent incorporation.

## 2. **Common Law Fraud Pled with Sufficient Particularity**

Under New York law, a plaintiff alleging fraud must plead five elements: 1) a material misrepresentation; 2) made by a defendant knowing that it was false when made; (3) with the intent to defraud; 4) upon which the plaintiff reasonably relies; and 5) which causes the plaintiff injury. *See Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney, Inc.,* 668 N.E.2d 1370 (N.Y. 1996)).

The heightened pleading standard for fraud claims does not require the plaintiffs to come forward with "proof" at this early stage of the litigation. Rule 9(b) only requires that the "party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). While a plaintiff may not rely on legal conclusions or mere recitation of the elements of a cause of action, it is not required to produce documents or other evidence to support the factual allegations in the complaint.

Plaintiffs have stated a claim for fraud under New York law. They allege that defendants knowingly and routinely misrepresented in its bills and NF-3 forms that: 1) Excel was lawfully licensed; and 2) the services billed for were provided by Excel. Compl. ¶ 170. These representations were false. Excel was not lawfully incorporated because: 1) the company was actually owned and operated by the non-physician Management Defendants, rather than physicians; 2) the Nominal Owner Defendants did not actually practice medicine through the corporation; 3) the radiology services at Excel were actually provided by independent contractors; and 4) the corporation unlawfully split fees with the non-physician Management Defendants. *Id.* These statements were material because they rendered Excel ineligible for no-fault reimbursement, and were intended to induce reimbursement by plaintiffs. Liberty Mutual has made numerous factual allegations supporting the existence of such a scheme, such as the

40

fact that some of the Nominal Owner Defendants were trained in specialties other than radiology; that some defendants continued to live and practice in states other than New York; and that the Nominal Owner Defendants did not engage in ordinary due diligence when buying and selling shares in the corporation. Plaintiffs have detailed specific fraudulent representations in a chart attached to the complaint. *See id.* Ex. 1. No further particularity is required.

### 3. Unjust Enrichment

Unjust enrichment is a quasi-contract claim designed to prevent "a person [from] enrich[ing] himself unjustly at the expense of another." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009). "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted). Plaintiffs' allegations that they paid defendants monies for which they were not entitled under New York's no-fault scheme due to their fraudulent incorporation and billing are sufficient to state a claim for unjust enrichment. *See, e.g., Rabiner,* 749 F. Supp. 2d at 102-103.

### B. RICO

#### 1. General Principles

The RICO statute, 18 U.S.C. § 1962(c), makes it "unlawful for any person engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3)

41

through a pattern (4) of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.,* 187 F.3d 229, 242 (2d Cir. 1999).

## 2. **Enterprise**

A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981); *see also United States v. Applins*, 637 F.3d 59, 73 (2d Cir. 2011). It "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Bankers Trust Co. v. Rhoades,* 741 F.2d at 515. The enterprise must be separate from the pattern of racketeering activity, *Turkette,* 452 U.S. at 583, and distinct from the person conducting the affairs of the enterprise, *see Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161-62 (2001); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994)

Courts look to the hierarchy, organization, and activities of an alleged association to determine whether it functioned as a unit. *See, e.g., United States v. Coonan*, 983 F.2d 1553, 1560-61 (2d Cir. 1991). "RICO requirements are most easily satisfied when the enterprise is a formal legal entity." *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). For an association of individuals to constitute an enterprise, the individuals must share a common purpose of engaging in a particular fraudulent course of conduct and must work together to achieve that purpose. *Id.*

42

Defendants claim that plaintiffs have failed to show that the enterprise alleged is sufficiently distinct from the racketeering activity.  Non-Freilich Defs.' Reply Mem. 11-14, Doc. Entry 55, June 8, 2012 ("Non-Freilich Defs.' Reply Mem.").

Plaintiffs contend that Excel is an ongoing enterprise under 18 U.S.C. § 1961(4). Compl. ¶ 162.  Corporations are expressly included in the definition of enterprise.  *See* 18 U.S.C. § 1961(4); *see also First Capital Asset Mgmt., Inc.,* 385 F.3d at 173 ("[A]ny legal entity may qualify as a RICO enterprise.").  Although the purpose of Excel was fraud, a wholly illegitimate organization, just like a legitimate one, may constitute a RICO enterprise.  *Turkette,* 452 U.S. 576.  The elements of "enterprise" and "pattern of racketeering activity" remain distinct even when the allegations and proof of those elements overlap.  *Id.* at 583.

While the defendants were nominal or actual owners of Excel, the fact that a RICO defendant owns the alleged corporate enterprise does not violate the distinctness rule.  A "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001).  RICO's distinctness rule is satisfied "when a corporate employee [the RICO defendant] unlawfully conducts the affairs of the corporation" alleged to constitute the RICO enterprise.  *Id.* at 166.

Plaintiffs have adequately pled the existence of a RICO enterprise.


### 3. Conduct

The Supreme Court has interpreted the phrase "to participate  . . .  in the conduct of [the] enterprise's affairs" to mean participation in the operation or management of the enterprise. *See Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993); *see also Azrielli v. Cohen Law Offices,* 21

43

F.3d 512, 521 (2d Cir. 1994) ("[O]ne is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'").

Defendants complain that the plaintiffs "fail to particularize the specific roles and acts of the Defendant[s, including] how they were involved in the alleged scheme, which is required to make out a claim." Non-Freilich Defs.' Mem. of L. 20.

In the present case, Liberty Insurance's allegations that Excel was owned and controlled by the Management Defendants and that the Nominal Owner Defendants agreed to serve as the "paper" owners of Excel in exchange for a fee are sufficient to support the claim that the defendants actively participated in the creation or management of Excel.

### 4. Racketeering Activity Requirement

"Racketeering activity" includes any act indictable as mail fraud. 18 U.S.C. § 1961(1). The elements of mail fraud are "(1) use of the mails to further (2) a scheme to defraud with (3) money or property as the object of the scheme." *Porcelli v. United States,* 404 F.3d 157, 162 (2d Cir. 2005) (citing *United States v. Gole,* 158 F.3d 166, 167 (2d Cir. 1998)). The elements of a "scheme to defraud" are "[1] the existence of a scheme to defraud, [2] the requisite scienter (or fraudulent intent) on the part of the defendant, and [3] the materiality of the misrepresentations" *United States v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000) (internal citations omitted). "While there is no requirement that the defendant personally mail a letter, the plaintiff must show 1) that the defendant caused the mailing . . . and 2) that the mailing was for the purpose of executing the scheme or . . . incidental to an essential part of the scheme." *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir. 1992) (internal citations and quotations omitted).

Where a RICO violation is predicated on fraud, Rule 9(b) of the Federal Rules of Civil Procedure must also be satisfied. *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172 (2d Cir.1999).

44

> In the RICO context, Rule 9(b) calls for the complaint to "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)). The plaintiffs must also "identify the purpose of the mailing within the defendant's fraudulent scheme." *McLaughlin*, 962 F.2d at 191. In addition, the plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996).

*Id.* at 173. A plaintiff must also establish "'reasonable reliance' on the defendants' purported misrepresentations." *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004).

Defendants claim that plaintiffs have failed to plead fraud with sufficient particularity, and specifically that they have failed establish the requisite scienter. *See, e.g.,* Non-Freilich Defs.' Reply Mem. 14-15.

Plaintiffs' have adequately pled all of the elements of mail fraud. The complaint asserts a detailed fraudulent scheme in which the "defendants knowingly have misrepresented and concealed facts related to Excel in an effort to prevent discovery that the professional service corporation is unlawfully incorporated." Compl. ¶ 142. The Management Defendants entered into an agreement to share the no-fault benefits earned by Excel with the Nominal Owner Defendants, Compl. ¶¶ 44-46; all defendants intentionally misrepresented that Excel was legally incorporated as a medical professional services corporation and the services were provided by its employees rather than independent contractors, *id.* ¶ 142; these defendants knew of and chose to participate in the fraudulent scheme, *id.* ¶¶ 156; and "the predicate acts of mail fraud are the regular way in which [the defendants] operate Excel," *id.* They have specified particular fraudulent representations, made in NF-3 forms submitted through the mail, in a chart attached to the complaint. *Id.* Ex. 1. The factual allegations adequately demonstrate defendant had motive and opportunity to commit the fraud and create a reasonable inference of the requisite intent.

45

Plaintiffs' allegations are sufficient to satisfy the racketeering activity requirement.

### 5. Pattern Requirement

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989).

Here, these elements are satisfied by plaintiffs' allegations that defendants submitted multiple fraudulent bills over a period of years; "[t]he Defendants continue to submit/or attempt collection of the fraudulent billing," Compl. ¶ 158; and "the intricate planning required to carry out and conceal the predicate act of mail fraud implies a threat of continued criminal activity," *id.* ¶ 157.

### C. RICO Conspiracy

It is unlawful for "any person to conspire to violate any provisions" of the RICO statute. *See* 18 U.S.C. § 1962(d). "When read in conjunction with the language of § 1962(c), RICO's conspiracy provision thus proscribes an agreement to conduct or to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity." *United States v. Pizzonia,* 577 F.3d 455, 462 (2d Cir. 2009). Because a RICO conspiracy charge need not specify the predicate or racketeering acts that the defendants agreed would be committed, it is sufficient to allege and prove that the defendants agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity. 18 U.S.C.A. § 1962(d). To state a RICO claim under subsection (d), plaintiffs must establish that each defendant agreed personally to

46

commit at least two predicate acts. *E.g., United States v. Teitler,* 802 F.2d 606, 612–13 (2d Cir. 1986).

Plaintiff has adequately pled an alleged agreement among Management Defendants and Nominal Owner Defendants to submit fraudulent bills to insurers for radiology services for which Excel has never been entitled or eligible to recover payment.  *See* Compl. ¶ 164 (Defendants "knowingly . . . agreed, combined and conspired to conduct and/or participate, directly and indirectly, in the conduct of the Excel Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United states mail to submit thousands of fraudulent bills to Liberty Mutual and other insurers.").  The complaint contains sufficient support for a finding that each defendant agreed to commit every predicate act alleged to have been committed.  While the Nominal Owner defendants did not participate in the day-to-day operations of Excel, it is alleged that they knew that that company would submit bills to insurers that fraudulently represented that they owned, operated, and practiced through it.  Defendants' motion to dismiss the conspiracy claim is denied.

IX.    **Conclusion**

Defendants' motions are denied.  Liberty Mutual's causes of action have been sufficiently alleged.  When plaintiffs learned of the fraud, and whether defendants' efforts to conceal the fraud misled the plaintiffs, remain issues for the jury.  Arbitration of any unpaid claims is stayed pending decision on plaintiffs' demand for a declaratory judgment.

The case is set down for jury selection and trial on October 22, 2012.

All *in limine* motions shall be heard on October 9, 2012.  By that day, the parties shall provide each other with lists of witnesses and summaries of their proposed testimony, lists of marked exhibits, and proposed jury charges.

A hearing on *Daubert* and dispositive motions shall be held on September 24, 2012.

The magistrate judge is respectfully requested to expedite discovery and engage the parties in settlement negotiations.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   June 21, 2012
          Brooklyn, New York